## RIGHTS AND DUTIES OF AN ADMINISTRATOR UNDER AN ORDER TO CONTINUE A BUSINESS.

Probate Court of Cuyahoga County.

IN RE ESTATE OF E. T. KOHANYI, DECEASED.

Decided, July 3, 1914.

*Administration of an Estate Under an Order to Continue the Business of the Decedent—Duties and Liabilities of the Administrator— What Are Proper Expenditures Under Such an Order—Extra Compensation for Extraordinary Services—Statutory Compensation Under an Order to Continue a Business—Allowed on Funds Under Control of the Administrator But Not Coming Into His Physical Possession—Attorneys Fees.*

1. Where a going concern passes into the hands of an administrator, the court will rely on his ability to handle the business to the advantages of the estate and will not scrutinize acts of a discretionary character in the absence of any showing of bad faith or of incapacity.

2. It will be presumed in the absence of a showing to the contrary that an action brought against the estate was properly defended, and where such an action results in a judgment against the administrator he is justified in paying other claims of like character.

3. An administrator operating a business is entitled to statutory compensation on funds under his control and for which he is responsible, notwithstanding such funds did not come into his physical possession.

4. Where it appears that the business has been successfully conducted, the debts paid and confidence imparted to the enterprise, extra compensation which together with the statutory commissions to the administrator does not exceed three per cent. of all the funds passing through his hands, is regarded, under the circumstances of this case, as reasonable allowance.

5. A court would not be justified in such a case in ordering an examination to be made of the books of the business at the expense of the estate, where it is evident from the account, filed by the administrator that the books have been well kept; but the books will be made accessible to interested persons desiring to examine them at their own expense.

*Price, Alburn & Daoust,* for administrator.
*Reed, Eichelberger & Nord,* for Charles Von Dobay.
*Hugo E. Varga,* for Bertha Kohanyi.

HADDEN, J.

E. T. Kohanyi, during his lifetime, was the owner and publisher of an Hungarian daily newspaper, *Szabadsag,* in this city. He died March 10th, 1913, intestate, and John H. Price was appointed administrator of the estate, and under orders of the court continued the newspaper business until such time as it should be deemed wise to turn it over to the heirs, or to sell it as a going concern. On the 28th day of March, 1914, the administrator filed his partial account, and to this four sets of exceptions were filed. Two of these were filed by Charles Von Dobay, acting as attorney in fact for the mother of the decedent, who resides in Hungary, a third was filed by the attorneys at law for Dobay, and the last was filed by the attorney for the widow.

The two exceptions filed by Dobay, for the most part, are general criticisms of the administrator's conduct and method of running the newspaper business. He criticises the administrator for employing F. Kiss in the West Side office, and claims that the administrator is using the newspaper as a tool, for settling private difficulties. He objects to the discharge of Polya and another old employee, and wants a public accountant to look over the books. He further insists on being appointed co-administrator and co-manager of the proposed corporation the heirs are forming. He objects to the formation of such a corporation, and insists that it should be a partnership. He claims that it is the administrator's own fault that so much of the administrator's time was consumed in the management of this business, and further that the administrator only did his duty and should not boast of his achievements in this enterprise, inasmuch as the increased circulation and prosperity of the paper was entirely due to the splendid men under him, and not to any efforts of his own. In one breath, he asks that the administrator collect all accounts outstanding, amounting to some $17,000, and pay off

the balance of the indebtedness, and in the next breath he objects because the administrator has collected so many outstanding accounts, saying that it will hurt the future business of the paper. He insists that the raises which were given the employees' were not fairly applied, and that the administrator is biased in his conduct of the paper and acts on wrong information, and only appeared at the office once or twice a week when checks were to be signed.

I have stated these objections of the exceptor quite fully, although not at the same length in which they are set forth, in order that it may be seen just what their scope and effect is. It will be seen at a glance that they are general criticisms of the administrator's method of conducting the newspaper. They are not supported in any way by testimony, nor are they so formulated that the administrator can very well meet them in open court. No testimony was offered as to the truth of any of these statements, and if it had been, much of it would of necessity have to be held irrelevant. If the exceptor wants a public accountant to go over these books, the thing for him to do is to get one, and pay for the accountant out of his own pocket. The court does not think it would be justified in going to this expense for the estate, in view of the situation, but if any of those interested in the estate are not satisfied with the account as rendered, and want an accountant to examine the books, the books are accessible and at all times open for full investigation by any accountant sent by parties interested in this estate.

As to the discharge and hiring of employees, the court desires to say that it appointed Price administrator to take charge of this vast enterprise, because it had faith in his integrity, ability and business acumen to handle this business as it should be handled, and the court believes that he has done so to the best of his ability, and every act done by him was done in the belief that it would further the interests of the newspaper, and for the exceptor to say that the discharge of Dr. Polya was "unwarranted and unfair," or that Kiss should not have been employed because incompetent, is not getting us anywhere. The adminis-

trator must be allowed some latitude in doing this work, and if every act of his were to be scrutinized by the court, and made the subject of judicial inquiry, the court would have done better to take over the management of the paper itself, as it would be saving time in doing so. However, if the exceptor had any testimony tending to show that the administrator acted in bad faith in these matters, he did not present it to the court, and in this situation, the court can pay no attention to his general complaints.

As to the exceptor's insistence that he be appointed co-administrator, and that the heirs should form a partnership instead of a corporation, it seems clear to the court that this is entirely irrelevant, and has no place in this proceeding. A great many other objections are of a similar nature. They are much on the same footing as if the administrator had chosen to say in his introductory statement, that it was a fine day when he was appointed, and the exceptor undertook to deny it. The court takes it that the introductory statement preceding the account, was made because of the administrator's desire to give the court all the facts, so that the court could pass intelligently on the account and the matters connected therewith.

And it might be appropriate to say at this point, that this account is a model of its kind. The administrator has done more than is required of him, as a rule. The law requires that he shall only account for receipts and expenditures, but he has in addition given a list of the debts of the estate which are still outstanding; likewise of the accounts receivable, of the amount of money invested in new machinery and new equipment for the newspaper, of the insurance policies in force at the time, and of the names, nature of duties and salaries of employees and agents of the newspaper; and although the account is quite lengthy (seventy-eight pages), it is so arranged and tabulated that the court can tell at a glance what the condition of the estate is, and what all the money was spent for. It is a pleasure to the court to look over an account in which the facts and figures are so easily accessible, and which is so well arranged.

Some few items excepted to by Dobay are, of course, relevant and proper, but inasmuch as they are all included in the third series of exceptions, filed by the attorneys for the exceptor, they will be considered there. These third exceptions were filed April 28th of this year, and attack a great many items in the account. I have tried to group them, and I will consider them in the order of groups as gathered.

The first group contains exceptions to the payments to Mr. and Mrs. Klosz, as well as a judgment obtained by Louis Klosz in the common pleas court, for $581. In the account appears the item: "July 3, Olerich & Co., Mr. and Mrs. Klosz's fare, $249. Voucher No. 484." Mr. and Mrs. Klosz were the father and mother of Mrs. Kohanyi, and the exception is based on the ground that this was not a debt of the estate. It seems at the time that Mrs. Kohanyi was sick, and wanted her parents to come and visit her to cure her homesickness. Her husband, Mr. Kohanyi, sent a cablegram asking them to come, saying that he would stand all expenses, and he furnished two steamship tickets. The payment in controversy was for these tickets. Klosz sued the administrator in the common pleas court for $781, for railroad fare and other expenses, not including the steamship fares, in crossing the ocean. The common pleas court held the estate liable to the extent of $581, on the strength of this telegram. The exceptor, however, claims that the administrator did not defend this litigation as it should have been defended, and that the cablegram (written in Hungarian) was not rightly translated; and the exceptor furnished what he claims to be a correct translation. But there seems to be no practical difference between this translation and the one furnished the common pleas court, except that the former uses the words thee and thou where the latter uses you. No negligence or bad faith was shown in defending this suit, and if the common pleas court thought that this cablegram created an obligation on the part of the decedent to pay railroad fares and hotel expenses for his father and mother-in-law in their journey to this country, it would clearly follow that there was a like obligation on him to pay for their steamship fares, especially

when these same tickets were ordered to Paris by him to await their arrival; and it is therefore clear to the court that this was a proper debt of the estate and was therefore rightly paid; and the exceptions are overruled.

The second group of exceptions comprise the funeral expenses. As these appear in the account, they are as follows:

May 8, Cunard Steamship Co., $100.00; voucher No. 220.

Aug. 1, Joseph Horvath, shipping body, $93.98; voucher No. 627.

Feb. 28, Mrs. Kohanyi, funeral expenses, $500; voucher No. 1740.

Mar. 12, Mrs. Kohanyi, funeral expenses, $682; voucher No. 1776.

The decedent died in this city, and after the funeral here, the body was shipped to Hungary and was interred there with proper rites. The exceptor claims that the cost of the funeral was excessive. He admits that the mother's consent in Hungary was obtained for these funeral expenditures, but he claims that this consent was only binding for expenses which were not excessive and extravagant. At no time during the hearing did the exceptor point out as to what charge he thought was excessive or extravagant, except possibly the delay in New York, incidental to the shipment of the body. Just what this expense was, was not shown. This court authorized the shipment of the body to Europe, and the expenses of the Hungarian funeral were duly ordered paid by this court, February 28th, 1914. Whether the exceptor had any notice of this application and order of the court, at that time, was not shown, but inasmuch as no testimony was produced showing extravagant or negligent expenditures on the part of the administrator in conducting this funeral, the exception will have to be overruled.

The next exception goes to the salary and commissions paid John Biro. The items excepted to are these:

Mar. 15, Salary paid John Biro. Then follows an exception to John Biro's raise of salary.

Aug. 1, John Biro, expenses, $20; voucher No. 630.

Sep. 2, John Biro, $5; voucher No. 781.

Oct. 11, John Biro, commissions on advertising, $100; voucher No. 981.

Dec. 18, John Biro, overtime on Naptar, $60; voucher No. 1352.

I can find no item of March 15th, 1913, for salary paid Biro, but I take it that possibly this exception goes to Biro's salary generally. Biro's salary first appears in the account as being $125 a month. Later, it was raised to $150 a month, and about January, this year, to $175 a month. The administrator justified this by saying that Warms, who was the editor, was getting $250 a month at first. Later he was sent to the New York office, and his salary reduced to $100 a month, and Biro took over his duties with an increase of only $25 a month, so that way the estate saved $125 a month on the combined salaries of these two men. There is not a shred of testimony that Biro was incompetent and inefficient, and so far as I can see, the administrator was entirely justified in paying him the salary that he did. As for the $20 and the $5 items, the administrator's testimony was that these were to reimburse Biro for necessary and incidental expenses in performing his duties as editor of the paper. No reason was shown by the exceptor why Biro should be compelled to pay for these out of his own pocket. As for the $100 item for commissions on advertising, the attack against it seems to be mainly on the ground that the administrator said that Biro was to get no commission for obtaining this advertising. The administrator testified that what he said was that Biro got no commission from the Mississippi Farms Company. He explained that it was a rule of the office, established by Kohanyi, that any employee who got advertising for the paper on his own time, should get ten per cent. commission. This applied to all employees, and the administrator said he knew that Biro had worked hard to get this advertisement. In this view of the situation, I can see no reason why he should not receive the commission so earned. As for the overtime work on the Naptar, amounting to $60, the administrator explained that all employees

who worked overtime on the Naptar (a newspaper almanac issued by the paper for the new year) received pay for such overtime in proportion to the time consumed and their regular salary. This being so, and it clearly appearing that Biro put in extra time, I can see no good reason for an exception; and the exceptions to all the above items are therefore overruled.

The next group of exceptions go to the reimbursement for the administrator's expenses, and the part payment of commissions to himself. They are as follows:

Apr. 30, John H. Price, expenses to New York, $48.50; voucher 203.

May 31, John H. Price, expenses, $6.85; voucher 363.

June 9, John H. Price, expenses of trip to New York, $86.55; voucher 431.

July 26, John H. Price, expenses of trip to New York, $44.10; voucher 600.

Sept. 7, John H. Price, expenses of trip to Pittsburg, examination branch office, $14.25; voucher 659.

Dec. 9, John H. Price, expenses trip to New York, $50; voucher 1298.

Mar. 9, John H. Price, expenses to New York, $45.80; voucher 1759.

June 10, John H. Price, compensation, $200; voucher 385.

July 3, John H. Price, compensation, $100; voucher 482.

July 15, John H. Price, cash, $200; voucher 569.

Aug. 2, John H. Price, compensation of administrator, $100; voucher 641.

Dec. 1, John H. Price, cash compensation of administrator, $500; voucher 1264.

The exceptor claims that these items are excessive. The first seven items are all for expenses of the administrator made necessary by his trips to New York and other branch offices. The exceptor inquires, why these many trips (six in all) to New York? The administrator explains it by saying that the New York office brings in about $25,000 a year, and personal conferences with the manager were at times necessary. The office in

New York publishes a New York edition, and contracts had to be talked over and made, advertisements had to be secured, the books and files of the office had to be looked over, and arrangements made for shipping the body of the decedent to Hungary. All this made the personal presence of the administrator absolutely necessary, and it is clear to the court that these expenditures were reasonable and necessary, and he was therefore entitled to reimburse himself therefor. As for the items of personal compensation, amounting to $1,100, it appears from the account that the administrator is entitled to statutory commissions in excess of $3,000. Of this, the administrator has only taken $1,100, and I can see no objection to his doing so under the circumstances, and the exceptions to all these items are therefore overruled.

The next group of exceptions go to W. E. Pagan's salary and commissions. The items excepted to are the following:

May 5, Walter E. Pagan, commission on advertising, $145.78; voucher 216.

June 5, W. E. Pagan, commissions, $127.77; voucher 372.

July 5, W. E. Pagan, commission on advertising, $90.46; voucher 496.

Sept. 11. W. E. Pagan, expenses, to Buffalo, $22.20; voucher, 834.

As to the first three items mentioned, the same thing can be said as was said in the case of Biro's commissions. Pagan earned the commissions by securing advertisments in accordance with a rule of the office, established during decedent's lifetime. His salary also was the same. Pagan's total income was about $250 a month. This may seem a bit large, but when we consider that it is no larger than it was prior to Kohanyi's death and since there is no question but what he did the work, and did it well so far as the court is informed, no good ground is shown why these exceptions should be sustained, and they are therefore overruled.

The last item is that of Pagan's expenses to Buffalo, railroad fare, hotel expenses, etc. This trip to Buffalo was in the interests of the newspaper, and no testimony was introduced tending

to show that it was unnecessary, or that the expenses were excessive, and this exception therefore is overruled.

The sixth exception goes to the salary of Bernice Richmond. No particular item in the account is attacked, the exception going to all of the salary received. Miss Richmond is a typist in the office of the *Szabadsag*. Her salary during the greater part of the time of her employment, was $40 a month, with the exception of the last three months, when it was increased to $45 a month. The only objection which the exceptor seems to have to the employment of this young lady, is that she was not a Hungarian. The administrator explains that he tried to get a Hungarian girl to do the work, but was not able to find any. The court does not understand that there is any obligation laid upon the administrator that only Hungarians shall be employed, and the exception is therefore overruled.

The seventh group of exceptions go to the payments made to Mary Sztopak and Goczel. A sample item, picked out by the court at random, reads as follows: Aug. 4, Theodore Goczel, for his expenses, $50; voucher 653. All these items are for the amount of $50, and are not for the salary of these people, for the account shows a salary paid them in addition to this. The administrator explains these items by saying that the money was kept on hand in the office for incidental and small office expenses, such as postage, etc. The check was, as a rule, drawn in favor of Mary Sztopak, who was employed in the office, but she received no benefit from it whatever; and the exceptions are therefore overruled.

The eighth group of exceptions go to the payments to Ernest Kiss. They are as folows:

June 10, Ernest Kiss, $200; voucher 387.

July 25, Ernest Kiss, in full of all acct. $107.40; voucher 585.

The testimony shows that this was for insurance on the newspaper plant. It is therefore a necessary expense of the business, and the exceptions to these items are overruled.

The next exception goes to the payment to M. Zucker. This item is: Feb. 28, Max E. Zucker, pay roll, $50; voucher 1738.

This objection was made on the ground that the salary of Zucker had been more than doubled in the short time of his employment there. The account shows he was getting $25 a week at first. At the beginning of the new year, 1914, he was given $31.25 a week, and this was his salary at the time the account was filed. The court therefore fails to see how his salary was doubled. The item in question apparently is his salary from February 14th to February 28th, 1914. No testimony was introduced, nor any valid reason given, why this should not be paid him, and the exception is therefore overruled.

The tenth exception goes to the item of August 4th, which reads: Mrs. E. T. Kohanyi's interest in auto, $300; voucher 656. The files of the court show that Kohanyi bought an automobile for $615, in October, 1912. In February, 1913, his wife traded it for another car, paying $450 of her own money in the bargain for the new car. Afterwards, the administrator sold this car for $800, and after paying the lien on the car, the court ordered that $300 be paid to the widow as representing the widow's interest in the car. As thus seen, it was her own money, and the exceptor's contention that this amounted to partial distribution, and therefore the mother should have thirty per cent. of it, is not well taken, and the exception is overruled.

The eleventh exception goes to the item of August 8th, which reads: John A. Ilburn, pay roll No. 31, Aug. 2 to Aug. 8, $319.98; voucher 661. The administrator explained that he was out of town at that time, and he had authorized Alburn to look after the pay roll and pay the men when payday came around.

There was nothing improper in this proceeding, and the exception is therefore overruled.

The twelfth exception is to the item of October 13th, Eugene Fried, expenses to Chicago, $25; voucher 984. This expense was incurred in the interests of the newspaper, in connection with the Chicago office, and the exception is therefore overruled.

The thirteenth exception is to the item of February 28th, Edward E. Daoust, expenses to Pittsburg, $14.35; voucher 1737. This, as appeared at the time of the hearing was the personal expenses of Daoust in looking after the estate's interests in Pitts-

burg.   The expense seems reasonable and proper, and the exception is therefore overruled.

The fourteenth exception is to the item of March 14th, Charles Von Dobay, pay roll No. 62, $37.50; voucher 1786.   The exceptor claims that he only got $18.75.   Voucher No. 1786, dated March 19th, is a statement from the bank that check No. 19460, payable to Charles Von Dobay, had been certified for $37.50. It is clear to the court, therefore, that the exceptor got a check for the amount claimed by the administrator, and the exception to this item is therefore overruled.

The fifteenth exception goes to every item in Schedule D. Schedule D is an itemized statement of all the receipts.   It does not attempt to give all the various items, but it only purports to give the total daily income, both gross and net.   The exceptor, neither in his exceptions nor at the time of the hearing, advanced any ground for his objection to this schedule, and the only objection that the court can possibly see, is that the administrator did not put down all the items from which this income was derived.   The administrator, at the time of the hearing, explained that this was not done, for the reason that there are fully fifty thousand such items, and it would require four large volumes in order that each item might be separately stated.   This would not only take a great deal of time, but it would also unnecessarily increase the size of this account, making it too bulky and voluminous, as well as greatly increase the court costs.   This, of course, would not be an insurmountable obstacle if anything were to be gained by such an accounting; but inasmuch as the books of the office are open to all the parties interested, and they have had full access thereto, I do not think that this is necessary, and should therefore not be required in this instance, and these exceptions are therefore overruled.

The only other matters excepted to are the extra compensation asked for by the administrator, and his request for an allowance for attorney's fees.   These are really objections to the allowance of fees and compensation, and will be considered in connection with the motions for extra compensation and allowance of attorney's fees, made by the administrator.

Now taking up the exceptions raised on behalf of the widow,
filed May 5th, 1914, it seems that the first exception is that the
administrator is only entitled to statutory commissions on $154,-
917.89, instead of $180,506.75.   The difference between the two
amounts is caused by the fact that the expenses of the branch
offices and agents' commissions are first deducted, and the bal-
ance is at stated intervals sent to the Cleveland office.   The first
amount mentioned, namely, $154,917.89, is the actual amount of
money which came into the Cleveland office, while the other
amount, $180,506.75, is the actual amount taken in by all the
offices and from all sources.   The exceptor's contention is that
not all of the latter amount passed through the administrator's
hands, and compensation can only be computed on the amount
which he actually got.   The administrator testified in this con-
nection, that the branch offices had no bookkeepers, and all the
bookkeeping was done in the Cleveland office, and that all the
branch office agents are under contract with the administrator
subject to his orders, and that he supervises the work of the
branch offices, and that all their work is done as employees of
the administrator.   It seems to the court that this is a clear
case of principal and agency, and the agent's possession is there-
fore the principal's.   The liability of the administrator extends
to the money taken in by his agents, and not merely to that
turned over to him.   If the agent loses it negligently, the admin-
istrator would be liable for it.   To hold otherise would be to cut
off the branch offices entirely from the authority of the adminis-
trator, and make them independent concerns, whereas they are
really acting under the control and authority of the administra-
tor.   It seems to me, therefore, that the administrator received
the amount of money handled by the agents, and his commission
should be computed on $180,506.75, making a total statutory com-
pensation of $3,730.13; and this first exception is therefore over-
ruled.

The second and third exceptions are really objections to the
allowance of extra compensation and attorney's fees, and will
be taken up in their proper order.

The fourth and last exception was withdrawn at the time of the hearing, by the exceptor.

Taking up now the application of the administrator for extra compensation for extraordinary services, I find that in addition to the $3,730 statutory commissions, the administrator asks $1,070. This would make his total compensation for the year, $4,800, or $400 a month. The main objection to the allowance of such extra compensation is on account of the total size of the entire compensation. Objector's claim is that a total of $4,800 for a year's work is excessive from its very nature, and should not be allowed. It does not strike the court that the fee asked for is excessive *per se*. We must look to all the factors in this situation before that can be determined. What were the difficulties to be overcome? What were the results obtained? How much time was spent? Was there any work done which was extraordinary for an administrator? What proportion of the fund created is asked for as compensation? All these are questions to be considered in determining whether the administrator is entitled to extra compensation, and if so, how much.

One of the first things that strikes the court as being extraordinary, in the sense that the administrator is usually not called upon to do work of this kind, is the fact that this is virtually a receivership plus administration. The administrator was running a large newspaper enterprise, with about sixty employees directly under him, and with about twenty branch offices. As administrator, his only duty would have been to try and sell the plant and other property which belonged to the decedent. By his successful management, however, he has so handled the business that $30,000 of decedent's debts have been paid off, and no new debts have been incurred. Other extraordinary duties which the administrator has performed in this instance, are those of selling the real property which belonged to the decedent, and of taking many trips to different cities where branch offices were located. It would thus seem clear that services were rendered which were extraordinary services for an administrator, and as such he should be compensated therefor.

Some of these difficulties, and the court's estimate of their worth, are as follows:

Prompt payment of current expenses every month,
  saving $100 a month.......................$   50.
Arranging for the extension of $50,000 debts due
  the decedent, and letters..................  200.
Sale of the Kohanyi homestead................  100.
Case of Louis Klosz v. Administrator.........   50.
Great amount of administrator's time taken in sett-
  ling controversies between heirs, and attend-
  ance at court by reason of such controversies..  200.
Installation of new business system, looking after
  many repairs and improvements, and overhaul-
  ing plant generally........................  400.
Maintaining harmony among employees..........  200.
Warding off libel suits......................  100.
Watching accounts receivable so that they are
  promptly collected.........................  100.
                                              _____
       Total  ...........................$1,400.

As for the results obtained, $180,506.75 has been realized from the enterprise. All current expenses have been paid, old debts amounting to $30,000 have been paid, and partial distribution has been made to the extent of $6,200; and in addition, a spirit of confidence and enthusiasm has been injected into the enterprise, and for all this the administrator asks a little less than three per cent. of the total gross receipts, as compensation. The court thinks that under the showing here made, he is entitled to it, and the motion asking for such allowance is hereby granted.

The motion for attorney's fees was filed at the same time as the account, and asks for a total of $1,560. Accompanying this application is an itemized statement of the work done by the attorneys. Since the hearing, extensions have been made opposite each item, and these, according to my figures, total, $1,597. Only $1,560 is asked for. I have looked over every one of these items,

and find that it was all work which was done in the interests of the estate, and the amounts charged are all reasonable. While objections were raised to the payment of these fees, no specific item was attacked as being improper or excessive. The sum of Dobay's objection seems to be that no attorney's fees should be allowed because the administrator himself is a lawyer. While this is true, it does not follow that the administrator would necessarily have to act as his own lawyer because he is one. It is sometimes unwise for a man to act as his own attorney, and it is at all times proper, and sometimes necessary, to call for the assistance of an attorney, where the administrator is situated as this administrator was. No valid reason has been pointed out, and the court can see none, why the amount asked for should not be allowed, and the application to pay these attorney's fees is therefore granted.

The order of the court therefore is, that all the exceptions to this account are overruled, and the application for attorney's fees and extra compensation are granted in the amounts asked for, and the account is approved and ordered recorded.